We will hear argument. Just one case this afternoon. Number 16-2502 Interval Licensing v. AOL. Mr. Hine. Good afternoon, Your Honors, and may it please the Court. The 652 patent identifies the starting point for the invention. It's at the bottom of Column 1 of the patent. It says the starting point are screen saver and wallpaper applications that were previously used for burnout and for aesthetic and functional purposes. If we take ourselves back over 20 years ago to March of 1996. The claims, they don't really talk about the wallpaper background in the claim or a screen saver, right? What the claims require, Your Honor, is an attention manager. That is what's specified. And as this Court construed in the prior case, it essentially captures some of the – But the claim construction doesn't actually say wallpaper or screen saver, right? It does not, Your Honor. It basically says – I can't remember now – displaying data in a way that doesn't interfere with the primary use of the display. Is that right? That's in the ballpark, Your Honor. That's in the ballpark. And then display of this secondary content can be any kind of content virtually, right? Well, it cannot be any kind of content. It has to be content that the user specifies. Okay. But other than that, yes, the user could specify. It can be either visual or audio. I don't think in the context of this claim it could be audio. I think it has to be visual. Why couldn't it be audio given that your patent says image means audio or visual stimulus? Your Honor, I don't think it can be audio, one, because of the Court's claim construction with respect to displaying images either when the user is not engaged in a primary interaction or in an area of the display screen that is not used by the user's primary activity. But more critically, there's a requirement in the claim of display instructions, for example, display instructions for enabling display of the image. Right, but then image is defined in the patent as any sensory stimulus, visual or audio. That is correct, Your Honor. And then there's an example of you can listen to a radio talk show. That's correct, Your Honor. So that's why I was thinking in my head, well, maybe I'm, you know, working on an opinion. I've got a window opened up. And, hey, now I want to listen to my Bon Jovi while I'm working on my opinion. That's kind of the same thing, right? I've got my primary activity, which is tap, tap, tap, tap, tap, you know, affirmed. And then there's the background secondary content, which is music. I don't think it's the same thing for three different reasons, Your Honor. First, I do think the claims are limited to display, display instructions. And I think that and the other language in the claim limits us to a display and not to some sort of sound sort of image. That's one. Two, it's different than the example because the user has to specify the content and the source of the content. And then the acquisition instructions go to that source, which can be a remote source, and acquire the content. And so it's a little different than doing something that is self-contained on your computer, let's say, where you're just turning on the music and listening to the music. And that's really the point that is made in paragraph in the first column, last paragraph in column one, is this invention is different than those screensaver and wallpaper programs because the images that they could provide were very limited. Why were they limited? The patent tells us they were limited because they were simple, self-contained programs that were not integrated with other computer resources. Okay. So before getting – I know you want to focus on these specific ideas of a screensaver or the wallpaper background of a display screen, but just getting more to the idea of a user who wants to request certain kinds of data from various data sources, say, on the Internet, and then having that data scheduled in some way and then displayed in some way, I mean, that in and of itself is pretty basic, right? The key for you is that all of that is coupled to this attention manager and then what you think an intention manager is. Is that a fair way to understand what's going on here? I think absolutely you have to look at the combination here. You have to look at the attention manager. I guess, in other words, if your claim did not say during the operation of an intention manager, then we wouldn't be here. Is that right? I think there's a good chance if it didn't say attention manager or if that wasn't the invention, they wouldn't have even filed for the patent application. If it was just using the Internet to get content, I don't know that there's an invention here at all, and that's really the problem is the district court here characterized the claim in a way that ignored that, completely ignored that. Let's look at what the district court did because among other things he gave you or rather he gave them on the pleadings, a decision based on the pleadings, so he never took any evidence, didn't do any of that, or she, I'm sorry. It was a she, if I remember. Here's what she said. One of the things that has puzzled me a little bit is exactly what is an abstract idea because that's what the judge said was wrong with your patent. It's an abstract idea with your claims, those particular three claims. The court finds that the assertive claims are directed to the abstract idea of providing information to a person without interfering with the person's primary activity. I'm reading now from Appendix 4, and then the court goes on to say, this basic and longstanding practice, does something that's basic and longstanding necessarily be abstract? No, Your Honor. No, okay. No. All right. We'll come back to that. Can be found in, for example, a television station's use of a breaking news ticker across the bottom of the screen, text only, et cetera. This is the one I like. Similarly, a lawyer's legal assistant may provide her with messages or mail in a manner that does not interfere with her primary activity, participating in a conference call. This could be accomplished at any time, et cetera. My law clerk, Noah, came into my chambers this afternoon while I was working on something and interrupted me to tell me about something else, and I told him he had to get out because he was an abstract idea. Do you think that's really an abstract idea? It's very difficult to draw the line between what is and is not an abstract idea. Traditionally, I think of an abstract idea as something that is performed mentally. It's performed by people. That's what an abstract idea traditionally is. Okay, performed by people. Performed by a person, yes. Okay. So then, you know, if someone is in a meeting and then another person writes a note on a piece of paper and slides it next to me and says, okay, the Lakers are now losing by 20 points, that entire interaction was something that's done by people. Yes, Your Honor, and that would not have been patentable, obviously. Somebody delivering a message like that would not have been patentable. Right, so in the law of 101, we would regard that as an abstract idea. Regardless of how we might think of the term abstract idea in a different context, for Section 101 purposes, we would think of that as an abstract idea. I think in that context, limited to that situation, yes. And then if someone instead sent me that same piece of information to, I don't know, my beeper, that would also be an abstract idea limited to a particular technical context, which wouldn't make any difference. I think at that point we have to start asking ourselves, what is the claim? What is the claimed invention as you start involving technological devices? Right, but if it's like on a phone, via fax, through a beeper, through a text, now the actual fact that there's technology involved, it actually kind of falls into the background of what is really the exercise, because the real exercise is to transmit information to me in a way that doesn't completely overwhelm what I'm trying to get done in the first place. If I could just change the focus a bit, I think what has to be done in Step 1 is to determine what the purported innovation is.  And if you characterize the claims in a way that ignores the improvement, then you've done something wrong. As the judge did here, the characterization here ignores the improvements. It literally encompasses the prior art screensaver and wallpaper programs. Yet our focus ought to be in Section 101 whether or not there is an improvement. And if so, what is the improvement, and is that abstract? And so the question here I think is, is the improvement abstract? The characterization is clearly wrong because it's completely untethered from the claims and ignores the improvements that are in the claims. It differentiated the prior art screensavers and the wallpapers because of the ability to go beyond the mere screensaver and wallpaper program to get content from external sources that were identified by the user. That's the improvement. How do we know that's the improvement? But what's in the claim? The claim says during the operation of an attention manager. And then the attention manager was construed quite broadly to just be the basic concept of displaying content in a way that doesn't interfere with the primary content. So, you know, I mean, when I look at my own computer right now, I have my window up with the opinion I'm working on, and then in the corner I see a clock. You know, that's content. That's the secondary form of content that is not interfering with my primary activity. I mean, arguably that can fit in the attention manager. If you look at attention manager alone and don't look back to March of 1996 and look to present day time, then there might be other things that appear on the display in addition to the primary interaction. Let's take ourselves back to March 1996. What was available at that time to do that? Screensavers and wallpapers. That's what was available. They were self-contained. They were simple. That's what the specification tells us. What did they not have? They did not have the capability of having the user identify that it wanted content from a specific source. It's a wallpaper embodiment. So if I have my Word document up and I'm writing in a document window, the secondary set of content, assuming we're just talking about visual content, not audio content, is going to pop up somewhere on my display screen that does not overlap with my Word document. Is that right? That's correct, Your Honor. So what if I dragged my window document over to that side of the screen where the secondary set of content is? What's going to happen? Are they going to be now overlapping each other? Is one going to be hidden from the other? Or does the secondary set of data migrate over to now the left-hand side of the screen? I'm just wondering, how does this actually work? I'm sorry. Because I didn't see in the patent specification how you come up with the way of presenting a second set of data to ensure that it does not interfere with the primary set of data on the display screen. It's the specification says, and the court's construction says for attention manner, it is displayed in areas of the display screen that is not used by the user's primary activity. So that's our reference point here. There are examples that are provided, for example, in declarations that were submitted. The actual source code that was used in order to implement the invention, it was submitted as part of a swear behind. Let's assume we don't go there. I'm just thinking if my document window doesn't cover up the entire display screen, but then I click on that little square icon, and then it gets blown up to cover the entire display screen, what's going to happen to my secondary set of data that I've, with user interface installation instructions, requested to be displayed? If I understand your question, Your Honor, I think what would happen is that secondary information would go away in that instance, if I understand the hypothetical that you're posing. But there's other aspects of the claim that provide the improvement. And in particular, it's the user interface instructions, the acquisition instructions, and the scheduling instructions. And specifically, when we look at the user interface instructions, those, along with the acquisition instructions, were what was used to distinguish the prior art. Because the prior art, back in 1996, did not have the capability to allow the user to specify the secondary content that was going to be displayed, either in a screensaver or in addition... The user interface instruction instructs what to do what. The user interface instruction, Your Honor, requires enabling provision of a user interface that allows a person to request the set of content data from the specified information source. That's just sort of a menu or something, some kind of option-providing screen. There has to be some sort of option-provided screen. There has to be some sort of screen where the user can specify, I want this content from this source. And then the attention manager has the acquisition instructions that takes that information and then goes and acquires that data without any further user interaction. And it may update it, it may go once a day, whatever the scheduling is, it will go and acquire the information. It will then be stored on the computer and then it will be scheduled for display according to the scheduling instructions. You've used your full time. I will restore your... Actually, five minutes for a rebuttal, please. Thank you, Your Honor. Thank you. Mr. Josepher. Counsel, let's begin with my question to your colleague there. When my law clerk came in to interrupt me, was he an abstract idea? Do you think he was an abstract idea? Noah is not abstract. However, ideas about things that Noah could do are abstract. And in this context, the point is that for step one, we're talking to what are the claims corrected to? Well, if we look at what the trial court said, the trial court didn't say that the legal assistant was providing an abstract idea. The trial court said the lawyer's legal assistant may provide her with messages or mail, no content discussed, in a manner that does not interfere with her primary activity, participating in a conference call. This could be accomplished at a certain time or in a certain location. And that's an example, along with the TV example, of an abstract idea. Now, I'm having just a little bit of... I'm slow in this area because I have a little trouble trying to understand exactly what is abstract. There are ideas that are abstract. In fact, an idea itself is kind of an abstract idea, but an abstraction. But Noah coming into my office was not an abstraction. Let me test this a little bit differently. Claim 18. You're familiar with claim 18 of the 652 patent, right? Of course. Okay. Let me rewrite it a little bit for you. I claim a computer-readable medium encoded with one or more programs for presenting on an otherwise unoccupied display device instructions for baking a chocolate cake, comprising acquisition instructions for enabling acquisition of a set of content data, etc., using the stuff that follows in claim 18. Would you be of the view that that, too, is an abstract claim? If I understood the hypothetical right, we've got the same claim, except it's limited to... I'm sorry. Speak up, please. Sorry. If I understood the hypothetical right, it's the same claim, except that it's limited to instructions for baking a chocolate cake. For baking a chocolate cake. And the answer, then, is that the idea... Yeah, I mean, the chocolate cake would not be abstract, but the idea, which is what... The idea of baking a chocolate cake is an abstract idea. The idea, sure. The idea of doing it. And so then the question is... The idea of having you stand in front of me and tell me that is an abstract idea? For certain. These are ideas in our heads, right? They're abstract. Any idea. Any idea is an abstract idea. I agree. And what an abstract idea is in itself somewhat abstract. Abstract idea is sort of a redundancy. So we could say that we're not actually in this room because we have an idea we're in this room, and therefore we're all abstract? There's a problem. Do you see the problem with this? I understand the linguistic issue with the abstract idea formulation. But, I mean, I do. But, obviously, the way that the Supreme Court has laid out the law is this. If we have a method of organizing human behavior... Don't blame it on us, but go ahead. So if we have a method of organizing human behavior, as in this case, as in Symantec, as in Accenture, for example, the method of organizing... I'm sorry. What was Symantec? I don't remember that. Symantec was discarding unread email based on the source or characteristics of the email. Did we describe that as a method of organizing human behavior? Yes. Done on a computer. And... I mean, that's a phrase... I didn't remember Symantec. That's a phrase that I had, I guess, always associated with the creation of obligations and authorities between people, which is what takes place in commercial... in the commercial world. But the words themselves apply to, you know, what goes on in a chemistry lab. Right? Add this, add that, add that, take out this, heat this. That's all human behavior. So it's got to be more limited than that. But the category of abstract ideas is not unitary. It's not just the kind of commercial stuff. It's not just the stuff that goes on inside one's heads. It's not just intangibles. It's also generalities, as distinguished from concrete implementations, as I think we've come to stress. Absolutely. And every one of those distinctions, I just said, is, you know, has much gray area around it. But... And it's all put under a label, abstract idea that has itself lots of room for implementation. But here we have, I take it, this is deciding what information you want, getting it in a way that doesn't... and displaying it in a way that doesn't divert you from whatever else you may be doing. Right. So it's the age-old practice with the assistant of, you know, please put a note on the corner of my desk to not distract me if certain things happen on a certain... you know, every half an hour, let me know what my calls were. If a certain development happens, please pass me a note to let me know. That type of... That's the pre-computer analogy. Can I ask you just... I think I know the answer, but I'm not sure. So our claim construction, I guess, last time of attention manager, a system that displays images to a user either when the user is not engaged in a primary interaction or in an area of the display screen that is not used by the user's primary activity. Is it agreed between the parties that the primary activity has to be on the computer, or can it be don't send something to somebody's display while they're, you know, baking a cake? I was thinking the primary... Well, on the second, there's two. I was first talking about primary interaction and the second about primary activity. The second, definitely, area of the display screen that's not used by the user's primary activity. It's the... What I wasn't sure is how much that tied to primary interaction, and I guess I'd sort of taken it as an assumption among the parties that we were talking within the realm. Judge Shen was talking about, about a primary activity on the computer and then a secondary delivery that doesn't... Right. The second half was absolutely... With what Judge Shen was talking about, absolutely. I'm using a portion of the computer, the so-called wallpaper environment that this Court said is not really a traditional wallpaper environment. That's the second one, where I'm looking at the computer. It's a different part of the screen that I'm using. The first environment, though, the first part, which has been described as the screensaver embodiment, I think the idea is there my primary interaction might not be looking at the computer, which is why you could then put up information on the computer screen without distracting me from my primary interaction. Was there, in the debate about claim construction or in any of the proceedings, do you know was there... Did this question arise, whether the primary activity can itself have nothing to do with the computer? Sorry, I... If there was anything on there, I missed it. You were 2-for-0 on this case earlier on an indefiniteness position, weren't you? On some of the other claims were held to be indefinite, yes. But you didn't think this claim could be attacked as indefinite? The other claims that were held to be indefinite used a claim term that's not in these claims. That's not in this, but that happens to be the language of the other claim. You didn't think this claim was sufficiently indefinite to raise that issue with a trial judge who liked that concept, I take it? Well, on remand, I mean, by the time this case got back on remand, you know, Alice had been decided and the parties agreed that teeing up 101 immediately made the most sense, which is why on remand Alice was new, 101 was the first thing to do. So you decided to shift ground. So everyone agreed it was logically the first thing to address there. And in terms of whether there's a technological improvement here, the arguments about screensavers and wallpaper, the important thing is the specification itself refutes that in two respects. First, the specification itself refutes the notion there's any technological advancement to either screensavers or wallpapers. And it does that in two ways. First, when it specifically discusses them, it discusses them as ways of using existing technology to just deliver this different content. So what does it say about screensaver APIs? It says it's appendix page 35, column 9, starting at line 16. You can implement this through the screensaver API, which is then commonly found in current operating systems such as Windows. So what it's saying is no technological improvement, just that API is already there, already delivering content as a screensaver. You can just deliver this other content through the same technological channel, no advancement. Excuse me, but abstract idea concept applies to claims, not to specifications. Why are you reading us to specifications? Because, I mean, one of the fundamental questions... The written description, more accurately. The written description. Right. Well, sorry. It's like, as, say, Amdocs noted, one of the key things here is, is there a technological solution to a technological problem? And a good place to start in order to figure that out is what the specification itself says about the claimed invention. And then, with respect to the wallpaper environment, which Embodiment, which agreed was... I mean, the construction here is it's not really wallpaper so much. It's just using a part of the display screen that's not otherwise in use. So I have a window open, I'm using it. If there's any unused space, it could pop up in the other unused space, essentially just a second window popping open. The specification doesn't claim to have invented multitasking or windows. Instead, elsewhere in the spec, at appendix page 32, column 3, line 30, it's in a different context, but the spec specifically says, if multitasking is allowed by the computer's operating system, which, again, is just confirming repeatedly that all that's going on here is, if the computer has this capability, then you can use it to deliver different information. The specification also says in about eight different places that it's using conventional computer technology, you know, conventional digital computers. You've pointed to a few things that point to kind of conventional technology. I guess I want to ask the counterpart question about what's missing. Is there anything in the spec that says, here is a new way of segregating a section of the display screen by a new display driver that does something that hadn't yet been done on computers and their displays? Well, I mean, only to the extent that the specification describes, it says that computers had not yet been used before in the ways claimed here, which is to say computers had not yet been used before to perform this task of providing information. But I was asking a question that, at least sometimes in my mind, I think there's a question about whether there's any new how. Right, no. The answer's no. I was just trying to be clear that I wasn't overstating it. If there's no new how, what, as a good lawyer, would you... how would you attack a claim in which there's nothing new? In which there's nothing... Well, obviously, in addition to 101, there's also 102 and 103, I assume, is the point of the question. Obviously, there's 103, yeah. Obviously. And it's not a novelty that there's 102. But still, the question still remains. 101 is still there, and the question is, at the outset, if the claim's directed to an abstract idea. And here, before I get to the claim steps, it's directed to the idea of providing information without distracting from the person's primary activity. You then move to step 2, is there anything inventive? Is there a technological development? And here you read the patent. It doesn't say that it's come up with new technology. It just says, here's something that hasn't been done on computers before. You can use existing computer technology to do this new thing on computers. And this Court by now has countless cases holding that by itself. You know, the best answer to my chocolate cake puzzle is 103, isn't it? Anybody who gives instructions on how to bake a chocolate cake, what's the first thing you would do if somebody came up with a patent claiming a chocolate cake or how to do a chocolate cake, and you had to decide the question of the validity of that claim? What would you say? Abstract, or would you say, hey, 103, there's enough prior art out there to cook this patent, wouldn't you? Well, in all seriousness, before doing a prior art search, if I read the claims and it was just at a high level of abstraction, bake a chocolate cake by doing things I wouldn't obviously do to bake any cake, then I wouldn't need to do a prior art search for 102 or 103 because it would be directed to an abstract idea. Yeah, you can't be faulted for throwing 101 abstract idea into the mix because everybody does it these days, so I'm glad to know you're in a, you should know you're in a clear line. The chocolate cake itself, that's a composition of matter, right? Yes, a claim to a chocolate cake would presumably be eligible. It's unquestionably, I mean, it's a physical product. What if I just said, what if I only said chocolate cake and I didn't say a chocolate cake comprising 10 different ingredients? Then would I have claimed the idea of a chocolate cake at too high of a generality such that now I've claimed nothing more than an abstract idea? Maybe I wasn't clear. My hypothetical was instructions for how to bake a chocolate cake, not how to, not a chocolate cake. The idea of making a cake as opposed to the cake itself. Yeah, the idea of making a cake. Which gets us back to Noah as a real person. It's not abstract, but the idea of things that you could have Noah do for you may well be abstract ideas. I guess the idea of going to get information about how to make a chocolate cake, acquiring that information, and then displaying it on a screen, I guess you'd say that's the abstract idea. Yes, I mean, obviously these claims are directed to this idea. Because now that's not, I mean, although we're talking specifically about how to make a chocolate cake and instructions for making a chocolate cake, it's really about information. We're trying to get information. We're trying to read information. And that entire exercise, we have concluded in different cases, is more or less, without more, an abstract idea. Yeah, I mean, like cases like Erie Indemnity, where remotely accessing user-specified information is an abstract idea. Infinity Labs, there are lots and lots and lots of these cases. And whether it's about, whether you're pulling up singing lessons for a parrot, or whether you're singing, pulling up something to entertain dogs and cats, or whether you're pulling up chocolate cake, it's all content that in theory could be, not in theory, but it could be within the claim scope. The point is that what the claims are directed to is this idea of providing information in the... Before you go, the other side was saying, okay, what's key here is we already have primary data, and now we're going to go get secondary data. And we are now allowing the user, him or herself, to be empowered to go out and select the secondary data. And that's the twist. And so now we've got a composite display of data, the primary data and the user-selected data. So now we don't have, this is unlike situations like when you're watching the news and there's a news crawl at the bottom of the screen which is not user-chosen, but network-chosen. So could you respond to that? Sure, two things. First, it's still analogous to the assistant hypo where I ask someone to deliver, give me certain types of information at certain times. But also, the court has a ton of cases now. You know, eerie indemnity, accessing and retrieving user-specified information is an age-old practice. Affinity Labs, you know, customizing a user interface is an abstract idea. And the specification here just says that the user interface installation instructions are conventional and readily available. That's appendix page 38, column 16, line 14, and also any appropriate user interface such as graphical buttons, appendix page 39, column 18, line 60. So again, there's no there there in the patent, and this court's also already been there several other times with similar patents. Thank you, Mr. Josepher. Thank you. Mr. Hine. Yes, Your Honor. Let me just start by responding to the question you asked earlier about primary interaction. There is a construction for primary interaction. It's on page 19 of our opening brief. It was actually agreed to during the Markman hearing in the case. Is it in the joint appendix in the brief? It's in page 19 of the brief. And you can also see it in column 8, lines 10 through 20 of the patent itself. But what it says is, any operation of the computer that occurs to enable or to support the performance of the function or functions that provide the basis for the user's use of the computer. So it's what the user is working on. Okay, so we're in the realm of one computer activity not being intruded upon by the secondary bit of information. That's exactly right, Your Honor. And then to respond to the point that Judge Plager made earlier about, well, you could just go after them on 103. Well, they tried that, Judge. They filed the reexamination early in this case and the case was stayed. One of the reasons we're eight years into this case is it was delayed several years for a reexamination. And the reason I raise that is the reexamination very clearly identifies what was different over the prior art. And it wasn't the abstract idea. It was the user interface installation instructions, the ability of the user to specify what was going to be provided in that secondary content and being able to get that from a remote source. And you can take a look at the appendix, page 1610, which is the examiner's reasons for allowance and the arguments that were made in the reexamination. I guess in terms of trying to understand this claim and accepting that the claim is about displaying a second set of data next to a primary set of data, and then, well, who chooses that second set of data? There's really two choices, either the user or somebody that's not the user. And so I guess the question is, why does it make a big deal why it's one category rather than the other category in terms of being regarded as an inventive concept when it's pretty old and basic for a user to be able to select what kind of data he wants to look at. There are actually three different ways, I believe, in which the information could show up. One, your computer could put it up like it occurs in a screensaver. Two, it could come from some central source, like the TV ticker technology, where another source is identifying what's going to go in that information. Or it could be the user. What's inventive about that? Nobody had done that in this sort of program back in March of 1986. We've got to put ourselves back over 20 years ago when this invention was developed. What about picture in picture? In that instance, the user is controlling and choosing what is being displayed in both little displays, right? And I don't remember if that was conventional back then or not. What I do know is the only evidence in this record about what was and was not conventional is the prosecution history, and it says it wasn't conventional. That's the evidence. We're at the stage of a judgment on the pleadings. There's clear and convincing evidence that is required in order for them to prove their case, and we have a situation where a judge with no evidence on her own decided that this entire claim was conventional. What is the evidence? The evidence is the intrinsic record. It's the specification. It's the prosecution history. The same stuff we look at for claim construction. The prosecution history here tells us that this was not conventional. What was not conventional? It was the ability of the user in a user interface to specify the content and the ability to go acquire that from remote sources. Those two things were argued over and over again in the prosecution history, and ultimately, that's why the claims were allowed. And the reason that's important is those are not abstract ideas. We have a situation, the Mayo situation, where there may be an overlap between the novelty question and the 101 inventive step question. This is the exact same fact question. The novelty question here focused specifically, for example, on the user interface installation instruction. That is not part of the abstract idea, and so the Mayo foreshadowing is occurring here. We've got a situation where the evidence that we have right now at this stage of the proceedings tells us that this is not conventional. And then the other point that I wanted to make in just a few seconds left is the step one analysis has to look at improvements. It has to look at improvements. If what you're doing is coming up with an abstract concept underlying the invention that is not tied to your improvements, then what have you done? You haven't conducted a fair analysis. As this court has said over and over again, every invention can be abstracted to a point where it would be ineligible. You've got to look at the claimed invention. Thank you, Your Honor. Thank you very much. Thanks to all counsel. The case is submitted.